No. 22-0464, In re H.D.

FILED
**June 2, 2023**
released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

Walker, C.J., dissenting, joined by Justice Wooton,

When a circuit court's order relies on erroneous findings of fact, discretion does not insulate it from error. The majority has misgivings about the findings of fact here, footnoting that they are "unduly harsh" characterizations of the record, but, in the name of deference, does backflips to factually justify an otherwise trumped-up order terminating parental rights without any evidence sufficient to make the finding that the conditions of abuse and neglect could not be remedied. For that reason, I dissent, and I am authorized to state that Justice Wooton joins me.

Going into the dispositional hearing, both the Guardian ad Litem and the DHHR were recommending that A.T. be put on a post-dispositional improvement period and maintained that, ultimately, reunification remained in the best interests of the child even if they could not yet recommend reunification. On the heels of the Guardian ad Litem's statement that she would like to see reunification happen and noting that she agreed with the DHHR's recommendation of an improvement period, the circuit court abruptly and inexplicably concluded that continuation in the home of A.T. was contrary to the welfare and best interests of H.D. and terminated A.T.'s parental rights. It did so even though the *only* evidence presented at the dispositional hearing related to whether A.T. should be granted a post-dispositional improvement period. There was no evidence

1

whatsoever elicited at that hearing relative to disposition, much less enough to satisfy the DHHR's burden to establish by clear and convincing evidence there was no likelihood that the conditions that led to the filing of the petition could be substantially corrected, and the facts here cannot support such a finding.

The findings that led the circuit court to conclude that the conditions could not be remedied relied heavily on the "harsh" (in the words of the majority) characterizations of the record. I take serious issue with the following findings, and I would find the decisions that flowed from this faulty factual foundation warrant a vacation of the termination order:

- "At the April 11, 2022, hearing, Adult Respondent [A.T.] admitted that she is a current drug addict actively using."

But at the time of the hearing, A.T. was (1) passing drug screens after her one-time relapse and (2) residing at St. Joseph's, an inpatient rehab, where it seems unlikely she was permitted to actively use drugs.

- "The [c]ourt finds that Adult Respondent [A.T.] has failed to show any success in addressing her methamphetamine use."

On the contrary, A.T. passed more than 70 drug screens after her adjudication, with only two failures for a single, isolated relapse, after which she again began producing negative screens and never produced another positive screen.

- "The [c]ourt finds that this case was filed on July 8, 2021, and the only effort to address her severe drug addiction was entering a rehabilitation facility on April 12, 2022. The Court finds that during the interim she continued her illegal drug use and remained an active addict."

- "The [c]ourt finds that long-term rehabilitation was the most critical condition of the improvement period due to Adult Respondent [A.T]'s severe addiction. The Court further finds that for the first eight months of the improvement period she failed to enter rehab and continued using illegal drugs."

According to these findings, a one-time use of methamphetamine that led to the filing of the petition and a one-time, isolated relapse (for a grand total of two methamphetamine uses throughout this entire case) constitutes a "severe"

methamphetamine addiction,[1] and one can somehow continue active illegal drug use whilst simultaneously passing dozens upon dozens of drug screens.

And, in the estimation of the circuit court, the outpatient rehab A.T. attended while waiting to be medically cleared for inpatient rehab and the sixty-day inpatient rehab seemingly count for nothing. Finally, the circuit court backdates the failure to get into long-term inpatient rehab for eight months to the beginning of the case as though it is wholly unexcused, despite that A.T. had an active tuberculosis infection that prevented her from being admitted to one of those facilities until she was cleared of the infection, which wasn't until February 2022.

- "Adult Respondent [A.T.] had a bed at Prestera Center which would have met the rehabilitation requirement. The Court finds that she told the center at intake that she did not have a drug problem and was denied admission. The Court finds that she reported that she was not addicted to illegal drugs at a time when she clearly was."

---

[1] The petition against A.T. for methamphetamine use arose from a single use during pregnancy. The ongoing drug addiction references made by both counsel for DHHR and the circuit court may be leveled at A.T.'s opiate addiction developed early in life, but managed through Subutex prescription. Importantly, that was *not* the basis of the petition filed against her and has no relevance to the basis for termination here.

This late-February Prestera encounter pre-dated A.T.'s relapse of March 24-25, and was at a time when A.T. was passing drug screens and *had been* passing drug screens for some seven months, so to say that she was "clearly" addicted to drugs at that time is an overstatement. Moreover, active use and/or last-use inquiries are well-known screening criterion for admission into rehabilitation facilities in a state such as ours that doesn't have the beds to spare for patients like A.T. who aren't and haven't been actively using. And, as noted below, A.T. testified she was prompted to lie about her drug use to gain admission to that facility and she refused to do it.

These findings, particularly relative to the failure to enter a long-term rehab until the "eleventh-hour" are entirely inconsistent with the facts and circumstances of the case, and, in my view, prompted the circuit court to employ a shoddy "too little, too late" analysis quick-triggering a termination without evidence sufficient to meet the burden of proof and without exploring less-restrictive alternatives.

Under other circumstances a "too little, too late" analysis may be an appropriate basis for termination of parental rights when viewed against the backdrop of drug use that continued throughout the proceedings. But contrary to the circuit court's findings, that simply isn't what we have here. Notably, the majority opinion doesn't reiterate any of those drug use findings in its analysis of termination of rights, nor does it conclude that the conditions of abuse and neglect were unlikely to be remedied based on A.T.'s drug use. Instead, it hangs its hat on A.T.'s inability to remedy the conditions in the

"near future." In doing so, the majority maintains the notion that the "too little, too late" to correct in the "near" future was the result of a totally unexplained eight-month delay in getting into a long-term rehab when it is undisputed that A.T. had an active tuberculosis infection that precluded her from inpatient rehabilitation until just before her parental rights were terminated.

Under the majority's analysis, the length of time it takes to get medical records (even after you have executed a release in October 2021) counts against you and negates any of the information contained in those medical records – which establish that A.T. had an active tuberculosis infection. It also ignores A.T.'s testimony that she and one of the DHHR providers "spent hours at our dining room table with lists, calling multiple rehabs. They would tell us over the phone that I was not – I would not qualify either because I had no recent use or because of the TB or both."

The circuit court repeatedly made statements to the effect of "We have heard from the beginning of the case, 'I can't go to rehab because I have TB.' She provided nothing. Her former counsel provided nothing . . . and it remained nothing until January of [2022]." Consider, though, that at a hearing on *November 2, 2021*, counsel for DHHR represented to the court "I . . . reviewed a bunch of medical records we obtained from West Virginia University; so rehabilitation facilities will not take [A.T.] . . . [w]ithout quoting directly from the medical records, she does have tuberculosis. She's doing a six-month treatment, which this was diagnosed July; so there will be no long-term place that will take

her because of the health problems she has." Then, counsel for DHHR posed to the court that the recommendation from A.T.'s psychological evaluation was for *outpatient* rehabilitation,[2] and stated again "we do not have any long-term rehab for her . . . . we have to get through the treatment for the tuberculosis or TB, so that won't be until January maybe." So, DHHR acknowledged the hurdles the tuberculosis diagnosis presented for getting A.T. into inpatient rehab (hurdles for *DHHR* to get her in), identified when inpatient rehab might be a possibility, but then holds A.T. accountable for "refusing" to go during that time.

It is later established (and confirmed by DHHR)[3] that A.T. finished the tuberculosis treatments in early February and was medically cleared at that point. Confusingly, despite admitting that medical clearance wasn't given until February 2022, the DHHR worker testified that there was a facility (Turning Pointe) willing to *look* at taking A.T. before that point if she took certain tests and concluded that A.T. could have

---

[2] Note also that the psychological evaluation recommends that "[s]hould she test positive during her CPS case, she should be required to complete a *short-term* residential rehabilitation program[.]"

[3] DHHR Worker Hall testified:

Q. Okay. Do you dispute the fact that the [Health Department] released her – (displayed document) – February the 7th of this year –
A. No.
Q. – having TB treatment? You're aware –
A. No.
Q. – of that ?
A. (Nodded.) I agree.

gone to inpatient rehab all along had A.T. only taken those tests. But, that letter from Turning Pointe states that an inquiry was made about (and it would need all records for) a patient who had been *exposed* to tuberculosis and stated unequivocally that it would *not* take her if she had an active tuberculosis infection because it could not adequately provide care for an active infection. Again, A.T. did have an active infection until she was cleared in February 2022.

Later in February, A.T. called and did intake over the phone for Prestera and drove there for admission into the long-term rehabilitation facility. Her primary worker met her there, but the secondary worker (who was not there) testified that A.T. was denied admission because she stated that she did not have a current drug problem. A.T. later clarified that she had not used methamphetamine in so long that she did not consider it a current drug problem, and that she was encouraged[4] to lie and say she was misusing her Subutex medication to gain admission and she refused to do so, afraid that the lie would impugn her credibility before the court in the abuse and neglect proceedings. Not long after, A.T. had her relapse, at which point she was then able to gain admission into an inpatient facility. In this sense, A.T. was placed in the position that *until* she relapsed, she wasn't able to comply with the circuit court's order to enter a long-term inpatient rehab.

---

[4] The record is not clear whether the person referred to in this portion of the testimony is the DHHR worker or the admissions worker at Prestera.

Following her relapse in March, A.T. was accepted at St. Joseph's inpatient rehab. However, both A.T. and her counsel stated that they were unaware the inpatient rehab was considered by the circuit court to be short-term as it was a sixty-day[5] program. After being informed of that at the MDT meeting on April 8, A.T.'s counsel was able to get a bed for her at a long-term inpatient facility (Lifehouse), and counsel advised her to go straight there. But, the DHHR worker admitted she told A.T. *not* to go over advice of A.T.'s legal counsel because "the case manager said that she wanted [A.T.] to stay [at St. Joseph's]" because she did not feel that Lifehouse, despite being long-term, would address the mental health issues that the case manager felt needed addressed.[6] The DHHR worker further testified that she told A.T. they would just wait and see what the judge decided since it was a bed (in an ever-elusive inpatient facility) even if it wasn't long term. The DHHR worker who told A.T. not to go to the long-term rehab prior to the hearing nevertheless threw the blame at A.T.'s feet, testifying that she did not feel A.T. was addressing the drug problem because "[s]he was court-ordered to go to a long-term rehab in August. She still has not entered a long-term rehab." The circuit court's order likewise reflects that A.T. had "refused" to enter long-term rehabilitation.

---

[5] Some portions of the record refer to it as a ninety-day program.

[6] Interestingly, the psychological evaluation states there is an "apparent absence of any significant mental health issues[.]"

Like the circuit court, the majority appears to deem getting into the right *kind* of rehab as more indicative of a parent's ability to correct a drug problem than is actually producing consistently negative drug screens through a *different* kind of rehab (outpatient, then short-term inpatient), which, at the time, was the best she could do with her diagnosis. As discussed above, we are dealing with a single, isolated two-screen-affected relapse that has been extrapolated into a severe methamphetamine problem; we are not dealing with the typical case where there is long history of methamphetamine use combined with a failure to test or often-positive screens. While full compliance with the terms of an improvement period is appropriately considered in determining whether to grant an additional improvement period,[7] it does not follow that because you aren't enrolled in the right kind of rehab you necessarily cannot correct the conditions of abuse and neglect that led to the filing of the petition, even if you produced a thousand negative drug screens.

Under the facts of this case, the "too little, too late" rationale doesn't hold water not only because it completely ignores the litany of negative drug screens in favor of emphasizing two positives, but it also ignores the glaring tuberculosis diagnosis that had a huge impact on the delay here. And, significantly, the circuit court appears to have amended its criteria for successful completion of the improvement period by order dated

---

[7] *See* West Virginia Code § 49-4-610(3), which provides, "The court may grant an improvement period . . . . when . . . . The respondent demonstrates, by clear and convincing evidence, that the respondent is likely to fully participate in the improvement period. . . ."

November 2, 2021 that "*If [A.T.] is eligible to attend long term rehabilitation after her TB treatments*, she shall attend a long-term rehabilitation approved by the Department."

Even so, the circuit court and the majority backdate the timeframe of A.T.'s eligibility to comply with admission into long-term inpatient rehabilitation to August 2021. Consistent with that erroneous finding, the majority focuses on A.T.'s inability to complete the long-term inpatient program "in the near future" as sufficient evidence that she could not correct the conditions of abuse and neglect so as to terminate parental rights. The circuit court was fixated on A.T.'s inability to meet the "timeframes" since she "waited" so long to get into the long-term rehab. I am perplexed as to what timeframes we are talking about here that would have demanded termination of parental rights as opposed to some other disposition even if the court was intent on not granting a post-dispositional improvement period. True, there are certain time limitations in the Code: the "15 of the last 22 months" rule found at West Virginia Code § 49-4-605 and limitations on the extension of improvement periods found at § 49-4-610. Importantly, the 15 of the last 22 months rule *and* the limitation on the extension of improvement periods found at West Virginia Code § 49-4-610(9) apply *only* to children in foster care, and this child was in the custody of the father until March 2022.[8]

---

[8] When those time frames are implicated, the DHHR is required to *seek* termination of parental rights.

Even assuming the "time frame" referenced relates to whether the rehabilitation could be completed within the statutorily-allowed six months for a post-dispositional improvement period, the statute also allows for a three-month extension of that post-dispositional improvement period.[9] By that time, A.T. could have completed the nine-month inpatient rehab with a month to spare. In fact, a six-month rehab would have been sufficient to meet the court's "long-term" rehab requirement and would have required no extension. I say that not because A.T. was unconditionally entitled to a post-dispositional improvement period or an extension of one, but to point out the flaw in the majority's conclusion that A.T.'s inability to *complete* the inpatient rehab was so far outside the "near future" that termination of rights was necessary, when, in fact, giving A.T. the time to complete the inpatient rehab would have been entirely consistent with the statutory framework.

Instead, what happened is that the circuit court took the "time frame" to complete an improvement period and treated it like a time bomb that had gone off and required the termination of parental rights. If we assume that the circuit court appropriately exercised its discretion to deny the post-dispositional improvement period, the procedure is simply to move to disposition, not necessarily termination. That is the crux of my dissent – that the circuit court and the majority have supplanted the substantive standard for termination of parental rights with a requirement that A.T. fully and technically comply

---

[9] West Virginia Code § 49-4-610(6).

with the terms of an improvement period, no matter how arbitrary the terms and irrespective of whether any improvement has actually been made during the improvement period.

We have repeatedly stressed that termination of parental rights is the most drastic remedy but in practice it is treated as anything but. While I personally would have granted the post-dispositional improvement period based on the factually-correct time frames (two months post-medical clearance to get into long-term rehab piggy-backed on a short-term inpatient rehab prior to that, and outpatient rehab prior to that) the more pressing concern to me is that in this case the circuit court jumped over all other dispositional alternatives that might have been appropriate and went straight to termination of parental rights when *no one* asked for it and *no one* proved it was necessary.

I cannot imagine a more appropriate case for a section 5 disposition[10] than this one – that at present, A.T. is unable to provide adequately for H.D. due to her participation in inpatient rehab (delayed because of her tuberculosis diagnosis). And, upon completion of that inpatient rehab, she could move the court for a modified disposition to dismiss the petition and reunite with H.D. by operation of West Virginia Code § 49-4-606,

---

[10] West Virginia Code § 49-4-604(c)(5) provides, in relevant part, that as a preferred alternative disposition to termination of parental rights, and "[u]pon a finding that the abusing parent or battered parent or parents are presently unwilling or unable to provide adequately for the child's needs," the court may "commit the child temporarily to the care, custody, and control of the department, a licensed private child welfare agency, or a suitable person who may be appointed guardian by the court."

13

the change of circumstances being that she has *successfully* completed a long-term inpatient rehabilitation. Conversely, if she failed to successfully complete the long-term inpatient rehabilitation and/or began actively using drugs, DHHR or the Guardian ad Litem could move under that same provision to modify the disposition to terminate rights at that point.

If A.T. is in the type of rehabilitation facility that allows children, even a disposition 4 might have been appropriate,[11] but none of those options were explored because no evidence on disposition was ever taken. In the wake of a denial of an improvement period that all parties recommended be granted, the circuit court treated termination as the default, not the last resort. While it will seemingly always be in the child's best interest to not have to wait, the statute has a tiered structure of dispositional preference for a reason. And, despite continued reliance on "permanency" for the child, *all* statutory dispositions are permanency options; termination of parental rights in favor of adoption is not the only way to afford a child permanency. Either of these dispositional options would have been especially appropriate given the Guardian ad Litem's testimony that it was in the best interest of the child to reunify with A.T.

_____

[11] West Virginia Code § 49-4-604(c)(4) provides that as a preferred alternative disposition to termination of parental rights, the circuit court may "[o]rder terms of supervision calculated to assist the child and any abusing parent or battered parent or parents or custodian which prescribe the manner of supervision and care of the child and which are within the ability of any parent or parents or custodian to perform[.]"

I decline to join the majority in deferring to the findings and ultimate conclusion of the circuit court, not only because I would have decided the case differently, but because I find that the circuit court's order terminating parental rights constitutes an abuse of discretion this Court should not bend over backwards to save. The unembellished facts of this case are substantively inadequate to show that the conditions of abuse and neglect cannot be remedied. Due process places a substantial burden of proof upon the DHHR to justify a termination of parental rights and affirming on these facts stomps on it. The majority has rewritten the standard for termination of parental rights as having little to nothing to do with actual progress and likelihood of remediation and everything to do with whether the technical and arbitrary[12] terms of an improvement period have been completed within a circumstance-ignorant timeframe.[13] Because I would hold the DHHR accountable

---

[12] It seems important to point out that under West Virginia Code § 49-4-604(c) the definition of "no reasonable likelihood that the conditions of neglect or abuse can be substantially corrected" means that "based upon the evidence before the court, the abusing adult or adults have demonstrated an inadequate capacity to solve the problems of abuse or neglect *on their own* or with help." (emphasis added). And, while the failure to "respond[] to or follow[] through the recommended and appropriate treatment" can meet that definition, the circuit court arbitrarily determined that A.T. required long-term, inpatient treatment when the recommendation of the psychological evaluation was that outpatient treatment was sufficient and that even upon relapse, short-term inpatient would have sufficed. So, the failure to explore less restrictive alternatives to termination when she was medically prevented from inpatient rehab is particularly harsh.

[13] This is especially true here where DHHR admitted the failure to get into *inpatient* rehab – a special term set by the court, not the MDT – was the only deficiency. A.T. received a favorable psychological evaluation during which she took responsibility for her drug use, completed parenting and life skills education, visited with H.D. under supervision, completed overnight visitations with H.D., entered therapy, and completed outpatient rehabilitation in addition to consistently testing negative for methamphetamine.

to meet its burden of proof and hold the circuit court's order to the proverbial due process fire, I respectfully dissent.